**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
NORTHWESTERN DIVISION**

| | | |
|---|---|---|
| Magnum Hunter Resources Corporation, | ) | |
| | ) | |
| Plaintiff, | ) | **ORDER GRANTING EX PARTE** |
| | ) | **TEMPORARY RESTRAINING ORDER** |
| vs. | ) | |
| | ) | |
| Eagle Operating, Inc., | ) | Case No. 4:10-cv-030 |
| | ) | |
| Defendant. | ) | |

Before the Court is the Plaintiff's "Motion for Temporary Restraining Order" filed on April 21, 2010. See Docket No. 3. The Plaintiff seeks a temporary restraining order enjoining and restraining the Defendant from performing any primary and/or secondary recovery operations (including the drilling and completion of wells) with regard to any oil and gas properties located in North Dakota jointly owned by the Plaintiff and the Defendant.

## I.   BACKGROUND

The plaintiff, Magnum Hunter Resources Corporation (f/k/a Petro Resources Corporation), is an oil and gas exploration and production company. Magnum Hunter owns PRC Williston, LLC for the purpose of acquiring working interests in crude oil and natural gas producing properties. The defendant, Eagle Operating, Inc., is an owner and the operator of certain oil and gas properties located in the Williston Basin in North Dakota. On December 11, 2006, Magnum Hunter and Eagle Operating entered into a written "Purchase and Sale Agreement" in which Magnum Hunter acquired an undivided 50% right, title, and interest in certain oil and gas properties held by Eagle Operating located in the Williston Basin. See Docket No. 4-2. Eagle Operating, in return, received $10 million cash and $10 million worth of Magnum Hunter's common stock.

Under the terms of the "Purchase and Sale Agreement," Magnum Hunter and Eagle Operating also entered into a joint venture for the primary and secondary development of certain oil and gas properties referred to as the "Development Program." The "Purchase and Sale Agreement" states, in part:

> 3.04  Exhibit "C" hereto is a "Business Plan" which shall include a general description of projects to be undertaken, a timeline estimating when each project will be commenced, and a budget estimating the anticipated costs of each project. Regular meetings (at least quarterly) shall be held to create and approve the current Business Plan for each quarter and to adjust the allocation of Development Program capital as needed. . . . The current Business Plan, in place at any given time, shall serve as authorization for Seller [Eagle Operating] to perform the projects identified prior to the next regular meeting. It is not the intent of this agreement to require Seller [Eagle Operating] to obtain expenditure approval for individual projects that are previously agreed to and included in the current Business Plan.
>
> . . .
>
> 3.07  Either Buyer [Magnum Hunter] or Seller [Eagle Operating] may request that the ongoing Development Program be halted to evaluate performance. The ongoing Development Program will be halted pending the necessary evaluation by the parties and third party experts (to the extent necessary) to determine its viability and possible remediation thereof. The parties will mutually agree on a course of action which may include, but is not limited to, remediation efforts, alternative water flood designs, additional drilling, deferral of capital spending, or redirection of capital into other projects.

See Docket No. 4-2, pp. 5-6.

In June 2009, Magnum Hunter and Eagle Operating created and approved a business plan that authorized Eagle Operating to perform certain projects. See Docket No. 4-9. According to Magnum Hunter, no business plan has been mutually agreed to by the parties since June 2009.

On January 8, 2010, Eagle Operating sent Magnum Hunter a letter with an attached "Authorization for Expenditure" that proposed new drilling operations for five new wells in Burke County, North Dakota. See Docket No. 4-10. Two of the wells included in the "Authorization for

Expenditure," the EFMU 26Hz and the EFMU 27Hz, are not identified in the June 2009 business plan. The drilling costs for these wells total more than $1.8 million each. See Docket No. 4-10, pp. 5-6.

The Declaration of Donald Kirkendall, senior vice president of Magnum Hunter, states in part:

> 5. During a telephone call on February 4, 2010, Magnum Hunter suggested to Eagle that the operations proposed in the [Authorization for Expenditure] should wait until a new mutually approved Business Plan was in place. Magnum Hunter also told Eagle that it was still waiting the receipt of both (i) a third-party Reserve Report for year-ending December 31, 2009 (the "Reserve Report"), and (ii) the results from a joint interest audit of expenditures associated with the Development Project (the "Audit"). Magnum Hunter explained to Eagle that the Reserve Report and Audit were essential to Magnum Hunter's ability to evaluate the performance of the Development Program and to decide on a new 2010 Business Plan. This being so, Magnum Hunter requested that Eagle defer the proposed operations and any additional capital spending in the Development Project until such time that both parties had opportunity to evaluate the Development Program and to mutually create and agree upon a new 2010 Business Plan that takes into consideration the findings of the Reserve Report and Audit. Eagle did not object to Magnum Hunter's request to postpone operations.

See Docket No. 4-1.

On February 12, 2010, Eagle Operating sent Magnum Hunter a letter that requested a cash call for the EFMU 27Hz in accordance with the "Authorization for Expenditure." See Docket No. 4-11. The letter states that Eagle Operating intended to commence drilling construction within a few days at an estimated cost of approximately $1.35 million. In a letter dated February 16, 2010, Magnum Hunter's attorney notified Eagle Operating of Magnum Hunter's request to halt the ongoing Development Program and to defer capital spending "until such time that the parties have had opportunity to evaluate the Development Program and to mutually create and agree upon a 2010 Business Plan that takes into consideration the findings of the forthcoming 2009 Reserve Report and

3

joint interest audit." See Docket No. 4-12. On March 4, 2010, Magnum Hunter's attorney sent Eagle Operating a second request to halt the ongoing Development Program and all related capital spending. See Docket No. 4-13. According to Kirkendall, Eagle Operating did not respond to either request and proceeded with drilling operations for the EFMU 27Hz well.

On March 15, 2010, Eagle Operating sent Magnum Hunter a letter requesting a cash call for the EFMU 26Hz well which states Eagle Operating anticipated commencing drillsite construction that week. See Docket No. 4-14. On March 17, 2010, Magnum Hunter responded to Eagle Operating's cash call request with another request to halt the ongoing Development Program. See Docket No. 4-15.

On April 7, 2010, Eagle Operating sent Magnum Hunter's attorney a letter which states Eagle Operating was awaiting a response from Magnum Hunter to a counteroffer made earlier that day. The letter also confirmed that "Eagle will not commence operations for drilling of any well until after 5:00 P.M., Friday, April 11, 2010." See Docket No. 4-16. Kirkendall contends that Eagle Operating is now refusing to inform Magnum Hunter about the status of operations for the drilling and completion of wells in the Development Program. See Docket No. 4-1.

On April 21, 2010, Magnum Hunter filed a complaint in federal court that seeks preliminary and permanent injunctive relief and attorney's fees and costs. Magnum Hunter contends that the absence of a mutually agreed upon business plan poses significant risk to the performance of the Development Program, and that if Eagle Operating continues operation of the Development Program without allowing Magnum Hunter to conduct a meaningful evaluation as allowed under the "Purchase and Sale Agreement" Magnum Hunter will suffer further damages and the waste of corporate assets and business opportunity. Therefore, Magnum Hunter moves for a temporary

restraining order enjoining and restraining Eagle Operating from performing any primary and/or secondary recovery operations (including the drilling and completion of wells) with regard to any oil and gas properties located in North Dakota jointly owned by the parties.

## II. <u>LEGAL DISCUSSION</u>

Pursuant to Rule 65(b) of the Federal Rules of Civil Procedure, in determining whether a temporary restraining order should be granted, the court must look to the specific facts shown by an affidavit to determine whether immediate and irreparable injury, loss, or damage will result to the movant. It is well-established that applications for preliminary injunctions and temporary restraining orders are generally measured against the same factors. <u>Wachovia Sec., L.L.C. v. Stanton</u>, 571 F. Supp. 2d 1014, 1031 (N.D. Iowa 2008). In determining whether preliminary injunctive relief should be granted, the court is required to consider the factors set forth in <u>Dataphase Sys., Inc., v. C L Sys., Inc.</u>, 640 F.2d 109, 114 (8th Cir. 1981). Whether a preliminary injunction or temporary restraining order should be granted involves consideration of "(1) the movant's probability or likelihood of success on the merits, (2) the threat of irreparable harm or injury to the movant absent the injunction, (3) the balance between the harm to the movant and the harm that the injunction's issuance would inflict on other interested parties, and (4) the public interest." <u>Wachovia Sec., L.L.C.</u>, 571 F. Supp. 2d at 1032 (citing <u>Dataphase Sys., Inc.</u>, 640 F.2d at 114).

It is well-established that the burden of establishing the necessity of a temporary restraining order or a preliminary injunction is on the movant. <u>Baker Elec. Coop., Inc. v. Chaske</u>, 28 F.3d 1466, 1472 (8th Cir. 1994); <u>Modern Computer Sys., Inc. v. Modern Banking Sys., Inc.</u>, 871 F.2d 734, 737 (8th Cir. 1989). "'No single factor in itself is dispositive; in each case all of the factors must be

considered to determine whether on balance they weigh towards granting the injunction.'"  Baker Elec. Coop., Inc., 28 F.3d at 1472 (quoting Calvin Klein Cosmetics Corp. v. Lenox Labs., Inc., 815 F.2d 500, 503 (8th Cir. 1987)).

### A.     PROBABILITY OF SUCCESS ON THE MERITS

When evaluating a movant's "likelihood of success on the merits" the court should "flexibly weigh the case's particular circumstances to determine 'whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined.'"  Calvin Klein Cosmetics Corp., 815 F.2d at 503 (quoting Dataphase Sys., Inc., 640 F.2d at 113).  At this preliminary stage, the court does not decide whether the party seeking the temporary restraining order will ultimately prevail.  PCTV Gold, Inc. v. SpeedNet, LLC, 508 F.3d 1137, 1143 (8th Cir. 2007).  Although a temporary restraining order cannot be issued if the movant has no chance on the merits, "the Eighth Circuit has rejected a requirement as to a 'party seeking preliminary relief prove a greater than fifty per cent likelihood that he will prevail on the merits.'"  Id. (quoting Dataphase Sys., Inc., 640 F.2d at 113).  The Eighth Circuit has held that of the four factors to be considered by the district court in considering preliminary injunctive relief, the likelihood of success on the merits is "most significant."  S & M Constructors, Inc. v. Foley Co., 959 F.2d 97, 98 (8th Cir. 1992).

Magnum Hunter contends that it is likely to prevail on the merits of its breach of contract claim because it can demonstrate that it has performed under the agreement and satisfied all conditions precedent to its right to halt operations of the Development Program.  Magnum Hunter further argues that it has presented evidence demonstrating that Eagle Operating has breached and

continues to breach the agreement by refusing to halt operations of the Development Program. The "Purchase and Sale Agreement" expressly provides that Magnum Hunter is entitled to equitable relief for Eagle Operating's breach of the agreement, and as such Magnum Hunter contends it is likely to obtain its requested injunctive relief.

The "Purchase and Sale Agreement" clearly states that either Magnum Hunter or Eagle Operating may request that the ongoing Development Program be halted to evaluate performance. The agreement further provides that regular meetings (at least quarterly) <u>shall</u> be held to create and approve the current business plan for each quarter and to adjust the allocation of Development Program capital as needed. <u>See</u> Docket No. 4-2.

The last business plan was created and mutually approved in June 2009. It did not include wells EFMU 26Hz and EFMU 27Hz. Eagle Operating sent Magnum Hunter several cash call notices which indicated that Eagle Operating anticipated beginning drilling on EFMU 26Hz and EFMU 27Hz within the near future. The estimated costs of the new drilling were in excess of $1 million. Magnum Hunter sent Eagle Operating several letters requesting it halt drilling operations in the Development Program, as allowed by the "Purchase and Sale Agreement." Eagle Operating ignored the requests until April 7, 2010 when it agreed to not commence drilling operations until after April 11, 2010. Magnum Hunter contends that Eagle Operating is now refusing to inform Magnum Hunter about the status of operations for the drilling and completion of wells in the Development Program.

A plain reading of the "Purchase and Sale Agreement" requires that the Development Program be halted upon the request by either party to evaluate performance. The agreement <u>requires</u> that the parties mutually agree on a course of action with may include deferral of capital spending.

The Court finds that at this preliminary stage of the litigation, and based on the information on file, Magnum Hunter has established a sufficient likelihood of success on the merits. Accordingly, the Court finds that this factor weighs in favor of the issuance of a temporary restraining order.

### B.     IRREPARABLE HARM

Magnum Hunter must next establish that there is a threat of irreparable harm if injunctive relief is not granted and that such harm is not compensable by money damages. Doe v. LaDue, 514 F. Supp. 2d 1131, 1135 (D. Minn. 2007). "The 'mere possibility' that harm may occur before a trial on the merits is not enough." Johnson v. Bd. of Police Comm'rs, 351 F. Supp. 2d 929, 945 (E.D. Mo. 2004). The party that seeks the temporary restraining order must show a significant risk of harm exists. Doe, 514 F. Supp. 2d at 1135.

The Eighth Circuit has held that a threatened loss of goodwill is sufficient to constitute irreparable harm. Medicine Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc., 336 F.3d 801, 805 (8th Cir. 2003). Also, other courts have concluded that the loss of an ongoing business "cannot be fully compensated by subsequent monetary damages" and "is not measurable entirely in monetary terms." Roso-Lino Beverage Distribs., Inc. v. Coca-Cola Bottling Co. of N.Y., Inc., 749 F.2d 124, 126 (2d Cir. 1984); Semmes Motors, Inc. v. Ford Motor Co., 429 F.2d 1197, 1205 (2d Cir. 1970). Courts have similarly found irreparable harm where a party is threatened with the loss of a business and customer goodwill. See Tom Doherty Assocs., Inc. v. Saban Entm't, Inc., 60 F.3d 27, 37 (2d Cir. 1995); Ryko Mfg. Co. v. Eden Servs., 759 F.2d 671, 673 (8th Cir. 1985) (affirming district court's finding that irreparable harm was shown and injunction was warranted when distributor would be possibly forced out of business).

Magnum Hunter contends that it will suffer irreparable harm if Eagle Operating is allowed to continue operations in the Development Program. Magnum Hunter argues that Eagle Operating will deprive Magnum Hunter of its contractual rights to evaluate the Development Program and proceed with operations strictly under a mutually-agreed business plan. Magnum Hunter further argues that it faces potential waste of corporate assets if the Development Program fails to achieve the contemplated results due to Eagle Operating's unilateral actions and refusal to allow Magnum Hunter to exercise its rights under the contract.

The Court finds, at this early stage, that Magnum Hunter has shown that it will suffer significant harm if Eagle Operating is allowed to continue operations in the Development Program. The Court further finds that at this preliminary stage of the litigation, Magnum Hunter has established that it will likely suffer irreparable harm if a temporary restraining order is not issued. Therefore, this factor weighs in favor of the issuance of a temporary restraining order.

### C.     BALANCE OF HARM

Magnum Hunter contends that a temporary restraining order will not harm Eagle Operating because Magnum Hunter ultimately bears the capital costs associated with the drilling and completion of the wells at issue. Magnum Hunter's requested injunctive relief serves to suspend operations for a period long enough to allow an evaluation of the Development Program's performance, as permitted under the agreement.  Magnum Hunter argues that Eagle Operating will merely be prevented from commencing drilling operations in the absence of a business plan that takes into consideration the important data and other information that is now becoming available to the parties.

If the temporary restraining order is not granted, Magnum Hunter contends that it will be wrongfully deprived of its contractual rights to evaluate the Development Program and proceed with operations under a mutually-agreed business plan.  The Court finds that the issuance of a temporary restraining order will not harm Eagle Operating, especially in light of the fact that Magnum Hunter bears the capital costs associated with the drilling and completion of the wells, and the issuance of a temporary restraining order will prevent harm to Magnum Hunter.  Thus, this factor weighs in favor of the issuance of a temporary restraining order.

### D.     PUBLIC INTEREST

Finally, Magnum Hunter contends that the development and production of oil and gas is in the public interest.  According to N.D.C.C. § 38-08-01, it is "in the public interest to foster, to encourage, and to promote the development, production, and utilization of natural resources of oil and gas in the state in such a manner as will prevent waste . . . ."  Magnum Hunter argues that it is

seeking to promote the most efficient and viable development and recovery of the oil and gas properties at issue, and that Eagle Operating's effort to conduct operations in the absence of a mutually-agreed business plan frustrates the public interest. Therefore, at this preliminary stage, this factor arguably weighs in favor of the issuance of a temporary restraining order.

### III.    CONCLUSION

After carefully reviewing the entire record, the Court finds that the Plaintiff has met its burden of establishing the necessity of a temporary restraining order. The Court **GRANTS** the Plaintiff's "Motion for Temporary Restraining Order" (Docket No. 3).

Based on the foregoing findings and conclusions, it is **ORDERED**:

1)   That the Defendant and any persons or entities acting in concert with or on behalf of the Defendant, unless by the written consent of the Plaintiff, shall be restrained and enjoined during the pendency of this action from performing any primary and/or secondary recovery operations (including the drilling and completion of wells) with regard to any oil and gas properties located in North Dakota jointly owned by the Plaintiff and the Defendant.

2)   That the Defendant shall appear in Courtroom One of the U.S. District Court for the District of North Dakota, in Bismarck, North Dakota, on **Wednesday, May 5, 2010 at 1:30 p.m.** to show cause under Rule 65 of the Federal Rules of Civil Procedure why it should not be restrained and preliminarily enjoined during the pendency of this action.

3) That the Defendant may at any time file a motion to dissolve or modify this temporary restraining order in accordance with Rule 65(b)(4) of the Federal Rules of Civil Procedure. If such a motion is not filed within fourteen (14) days after service of this order, the temporary restraining order shall be deemed consented to based upon the grounds set forth above until further order of the Court.

4) No bond shall be required to be posted by the Plaintiff before the temporary restraining order is effective.

5) The TRO was issued without notice for the specific reasons set forth in the Declaration of Kraft G. Eidman submitted in support of the motion for a temporary restraining order, which the Court incorporates by reference. See Docket No. 4-17.

6) The Plaintiff shall arrange for the immediate service of this order together with the Plaintiff's "Motion for Temporary Restraining Order" and supporting pleadings and affidavits, and shall promptly file proof of service with the Court.

Dated this 28th day of April, 2010.

> */s/ Daniel L. Hovland*
> Daniel L. Hovland, District Judge
> United States District Court